**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

United States of America,

               Plaintiff,

    v.

Gerald Williams,

               Defendant.

Case No. 2:21-cr-00246-JAD-BNW

**Report & Recommendation re ECF No. 28**

## I.     Introduction

The Government filed a Superseding Indictment charging Gerald Williams with being a felon in possession of a firearm and possessing methamphetamine with intent to distribute. ECF No. 24.

Mr. Williams filed a Motion to Suppress. ECF No. 28. The Government opposed at ECF No. 33, and Defendant replied at ECF No. 37. Mr. Williams filed supplemental briefing. ECF No. 56. The Government responded at ECF No. 58, and the defense replied at ECF No. 61. The Court held a hearing on Defendant's motion on August 3, 2022; August 12, 2022; and October 12, 2022. ECF Nos. 41, 44, and 62.

After considering the parties' arguments and the record before it,[1] the Court recommends that (1) the gun found at Spruce Hill be suppressed as there was no probable cause to believe that Mr. Williams was living there, which was necessary in order to invoke the parole search clause to search the residence, and (2) the Government not be allowed to use the post-*Miranda* statements in their case in chief at trial as they were obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004).

The following is a summary of the facts leading to the instant charges.

---

[1] The Court has reviewed the parties' briefs as well as the testimony and evidence presented at the evidentiary hearing.

1    Gerald Williams was on parole. One of his parole conditions required that he live at

2    Kolson Circle.[2] Another parole condition allowed parole officers to search, among other things,

3    his place of residence and car without cause or the need to obtain a warrant.

4    On March 11, 2021, METRO Officers Garboski and Hunt stopped the car Mr. Williams

5    was driving after he made an illegal U-turn. Based on some previous investigation, officers

6    believed Mr. Williams was selling drugs and in violation of his parole by not living at Kolson

7    Circle. Immediately after the stop, Mr. Williams was removed from the car, handcuffed, patted

8    down, and placed in front of the patrol car. After Mr. Williams consented to the search of the car,

9    METRO started to search but stopped in order to wait for Parole and Probation to arrive.

10    Shortly thereafter, P&P arrived and invoked the parole search clause, which was one of

11    Mr. Williams' parole conditions, to search the car. METRO and P&P officers questioned Mr.

12    Williams for approximately 20 minutes about where he was living and where he had been for the

13    last few weeks. They believed Mr. Williams was living at Spruce Hill,[3] where his wife and

14    children lived. Upon completing the search of the car, they found drugs and cash.

15    METRO and P&P decided they would invoke the parole search clause to search Spruce

16    Hill. These officers went over to Spruce Hill and METRO Officers Garboski and Hunt

17    transported Mr. Williams in their patrol car. Mr. Williams' wife refused to grant the officers

18    entry. Based on safety concerns, Officer Garboski asked Mr. Williams if there were guns in the

19    house. Mr. Williams said he had a gun in there. Officers entered Spruce Hill, located a gun, and

20    froze the premises in order to obtain a search warrant.

21    Once they obtained a search warrant, officers completed the search of the house. They

22    found three firearms, methamphetamine, two digital scales, and plastic baggies.

23    Mr. Williams was then, and for the first time, administered *Miranda* warnings. Officers asked

24    him questions about what was found inside Spruce Hill.

25    //

26    //

27    _____

[2] When the Court references Kolson or Kolson Circle, it is referencing 506 Kolson Circle.

28    [3] When referring to Spruce Hill, the Court is discussing the 5527 Spruce Hill Court residence.

1    **II.    Parties' Arguments**

2              **A.  Mr. Williams' Argument**

3          First, Mr. Williams argues the stop was unlawfully prolonged in violation of *Rodriguez v.*

4    *United States*, 575 U.S. 348 (2015) as there was no reasonable suspicion to believe he was selling

5    drugs or in violation of his parole. ECF No. 28 at 14-17. On that basis, he argues all evidence

6    flowing from the unlawfully prolonged traffic stop (including statements) must be suppressed. *Id.*

7    at 12-13.

8          Furthermore, he submits that the Government's reliance on the parole search clause to

9    justify the search of the car was unconstitutional. Oct. 12 Hearing at 35:40-36:11. According to

10   him, there was no evidence demonstrating that Mr. Williams was aware of the terms of his parole,

11   which was necessary for the invocation of the clause to comply with the Fourth Amendment. *Id.*

12   at 28:07-28:23; 28:45-36:11.

13         Mr. Williams also argues he was subjected to custodial interrogation during the car stop

14   and the transportation to Spruce Hill without being provided *Miranda* warnings. ECF No. 28 at

15   18-21. Thus, his position is that the statements he made while under custodial interrogation

16   cannot be used at trial. *Id*. at 21-22.

17         Moreover, according to Mr. Williams, neither the surveillance of Spruce Hill nor his

18   statements (which he argues could not be used because they were in violation of *Miranda*)

19   amounted to the "strong evidence" required to establish probable cause that he lived there, which

20   was necessary to invoke the search clause to search Spruce Hill. *Id*. at 22-24.

21         Mr. Williams also maintains that the search warrant officers ultimately obtained to search

22   the Spruce Hill residence relied on the unlawfully obtained information described above. *Id.* at

23   24-25. As a result, he asserts that evidence cannot be considered in the search warrant affidavit to

24   support probable cause that contraband would be found at Spruce Hill.[4] *Id*.

25   ─────────────

26              [4] This Court understands that the first part of Mr. William's Motion includes stand-alone arguments
     regarding the propriety of Mr. Williams' seizure, the search of the car, and the unMirandized statements made by Mr.
     Williams. But Mr. Williams' motion suggests that all of that information ultimately made its way to a search warrant

27   affidavit which officers ultimately relied upon to search Spruce Hill. Thus, what this Court must ultimately determine
     with regard to the search of Spruce Hill is (1) whether the evidence Mr. Williams argues was unlawfully obtained
     should be excised from the search warrant affidavit for purposes of determining whether probable cause existed to

28   search Spruce Hill and (2) determining whether the search warrant affidavit would still provide the necessary

Lastly, he argues the post-*Miranda* statements are inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004). *Id*. at 21.

### B.    Government's Argument

The Government first argues the stop is not subject to a prolongation analysis under *Rodriguez* because there was a reasonable belief that Mr. Williams was in violation of his parole condition, which allowed officers to arrest him as soon as he was pulled over. ECF No. 33 at 8-10. In the alternative, it argues any prolongation would have been justified as officers had reasonable suspicion to believe Mr. Williams was (1) in violation of his parole conditions by not living at Kolson Circle and (2) selling drugs. *Id*. at 10.

In addition, the Government asserts the search of the car was lawful on two different grounds. First, it submits invoking the search clause to search the car Mr. Williams was driving was constitutional as Mr. Williams was aware of the search clause and the car was under his control. *Id*. at 13-17. Alternatively, it maintains Mr. Williams consented to the search of the car. Oct. 12 Hearing at 16:25–16:30.

The Government does not argue against the notion that Mr. Williams was subject to custodial interrogation during the car stop and when transported to Spruce Hill. Nor does it argue that *Miranda* warnings were provided. Instead, it argues that while Mr. Williams was in custody nobody asked him any questions regarding the firearms and drugs charged in the superseding indictment. ECF No. 33 at 20-21. While officers did ask Mr. Williams whether a gun would be found inside the house before invoking the search clause, it argues Mr. William's admission is subject to the public safety exception to *Miranda* and thus admissible. Oct. 12 Hearing at 25:00–25:34.

With regards to the invocation of the search clause to search Spruce Hill, the Government's position is that there was probable cause to believe Mr. Williams lived there. ECF No. 33 at 18–19. This is based on METRO's investigation after receiving the anonymous tip, the surveillance of Mr. Williams at Spruce Hill, their determination that he had not been at Kolson

---

probable cause to search Spruce Hill after any such excisions. As will be explained in more detail below, this Court can only make the first determination. But it cannot determine whether the search warrant affidavit would have still contained probable cause to search Spruce Hill after any such excisions as it was never admitted into evidence.

Circle for three weeks, Mr. Williams' lies about when he had last been at Spruce Hill, and Mr. Williams' reference to Spruce Hill as "[his] house." *Id*. at 18.

Lastly, the Government argues that *Seibert* is inapplicable because Mr. Williams was not asked about the guns and drugs that are the subject of the superseding indictment during the first round of questioning. *Id*. at 21.

### III.    Findings of Fact[5]

#### A.  Mr. Williams signed a parole agreement.

Ms. Quiana Pascalau used to be a parole officer with the Department of Parole and Probation. ECF No. 50 at 23. At the time of her testimony, she was no longer employed there. *Id*. While working with P&P, she was responsible for supervising Gerald Williams. *Id*. at 9. She was supervising between 40 and 60 other parolees at the time she was supervising Mr. Williams. *Id*. at 9, 27.

Her initial meeting with Mr. Williams was in January 2021. *Id*. at 13. She always met with the parolees assigned to her and reviewed the parole agreement with them. *Id*. at 29. The meeting with Mr. Williams took place at 506 Kolson Circle, *Id*. Mr. Williams resided there as part of the MAT program.[6] *Id*. She went over the terms of the parole agreement with Mr. Williams and he signed the agreement. *Id.* at 15, 19, 28, 31. She did not recall the specifics surrounding that meeting (whether it was inside or outside, etc.). *Id*. at 13-14, 31.

Parole agreements in Nevada contain standard clauses that, as relevant here, allow for the search of a parolee's "person, property, place of residence, vehicle, or areas under his control" with or without cause for evidence of a crime or a violation of parole. Government Exhibit 3; ECF No. 50 at 19, 182-183. In addition, as part of his parole conditions, Mr. Williams could not change residences without the approval of P&P. ECF No. 51 at 40.

During the hearing, the Government showed Ms. Pascalau a parole agreement with Gerald Williams' name on it and the conviction for which Gerald Williams was on parole. ECF No. 49 at 15-16. But that agreement did not have Gerald Williams' signature on it. *Id*. at 16. Instead, it was

---

[5] This Court found the testimony of all witnesses to be credible.
[6] The MAT program is a drug program. ECF No. 49 at 16.

signed by an individual by the name of Curtis Sanders. *Id*., Gov's Ex 3. Ms. Pascalau could not explain why Curtis Sanders' signature was there instead of Gerald Williams'. ECF No. 50 at 15-16. Her signature appears on the agreement as the witness vouching for the fact that Gerald Williams signed the agreement (although Curtis Sanders' signature is on it). *Id*. at 29, Gov Ex 3. She supervised Curtis Sanders who also lived at Kolson. ECF No. 50 at 15, 28.

Ms. Pascalau entered all of her interactions with parolees under her supervision into a system (Otis); each entry in this system is referred to as "Chronos." *Id*. at 11. Chronos contains an entry on January 28, 2021 indicating Gerald Williams signed the agreement on January 26, 2021 and that a copy was provided to him. Gov Ex 2 at 577. Had Gerald Williams refused to sign the agreement, Ms. Pascalau would have included an entry on Chronos indicating so. ECF No. 50 at 20. No such entry appears on Chronos. Gov Ex 2. Chronos also contains, among other information, a February monthly report for Gerald Williams indicating he was attending counseling and updates on his community service requirement. ECF No. 50 at 34, Gov Ex 2 at 576.

Had Mr. Williams refused to sign the agreement, Ms. Pascalau would have brought him before the Parole Board because a person cannot be on parole without agreeing to the parole terms. *Id*. at 36, 38-40. She did not bring him before the Parole Board for failure to sign the agreement. *Id*. at 36.

This Court found Ms. Pascalau to be a credible witness. It is true that she received a disciplinary action in December 2020 for improperly disclosing confidential information to unauthorized parties. ECF No. 42. But a 2020 disciplinary action does not fatally jeopardize her credibility in late 2022, or with regard to Mr. Williams' supervision. ECF No. 42 at 2; Oct. 12 Hearing at 5:34-8:04, 8:26-10:38. First, her testimony was corroborated by other evidence in the record. Moreover, her testimony included embarrassing admissions, such as mistakenly vouching that the signatory to a parole agreement was Mr. Williams when, in fact, Curtis Sanders had signed the agreement. ECF No. 50 at 29. In sum, this Court found her to be credible.

**B. METRO Officer Mahar believed Mr. Williams was selling drugs based on an anonymous tip.**

METRO Officer Samuel Mahar worked in conjunction with P&P to investigate potential law violations. ECF No. 50 at 43. In March 2021, he learned by way of an anonymous tip that a Black man driving a white Cadillac sedan with license plate 085ZNY and who went by "Twin" was selling drugs in Downtown Las Vegas. ECF No. 50 at 48-50.

The investigation into this tip revealed the Cadillac was registered to Adrielle Williams at an address on Spruce Hill in the Las Vegas suburb of Summerlin. *Id.* at 50-52, 54. Further investigation revealed that a driver's license issued to Gerald Williams in 2017 listed that same address. *Id.* at 54. Officer Mahar ran a criminal record check and learned that Mr. Williams was on probation or parole and used the moniker "Twin." *Id.* at 54–56, 58. He also learned that Mr. Williams' 2018 Presentence Investigation Report listed the Spruce Hill address as his residence. *Id.* at 189, 214.

**C.    P&P officers went to Kolson Circle to see whether Mr. Williams was living there, as required by his parole terms.**

Officer Mahar reached out to P&P Officer Jerraco Lindsey and told him he believed Gerald Williams was selling drugs. Defense Exhibit A at 1. Officer Mahar confirmed Mr. Williams' girlfriend or wife lived at Spruce Hill and that the address Mr. Williams reported with P&P was at Kolson Circle. *Id.* at 2.

On March 11, 2021, P&P officers Lindsey, Gaddis, and Reinert visited the Kolson Circle address to see if Mr. Williams was living there or whether he was in violation of his parole terms. *Id.* at 60-61, 171, 192. The property manager told them that Mr. Williams lived there. ECF No. 49 at 123, 164 The officers also spoke to Mr. Williams' roommate. Gov Ex 2 at 574. The roommate said he had not seen Mr. Williams in the last three weeks. *Id.* at 154, 218–19. The officers did not inquire about the roommate's work schedule to see whether it was different than Mr. Williams'. *Id.* at 220. It is not uncommon for parolees to lie to parole officers. ECF No. 50 at 222.

There were only shorts and a pair of boxers on the bed on Mr. Williams' side of the room. *Id.* at 194–95. Parolees residing at places like Kolson Circle may choose not to keep many

belongings there. *Id*. at 224-25. But, by way of comparison, Mr. Williams' roommate's side of the room had several items of clothing, paperwork, and other items. *Id*. at 195.

Officer Lindsay told Officer Mahar that Mr. Williams' parole officer had not seen him at the Kolson address since October 27, 2020. Defense Ex A at 5; ECF No. 50 at 127. However, that information was incorrect because Ms. Pascalau had seen Mr. Williams at Kolson at some point in late January 2021. ECF No. 50 at 13, 19.[7] None of the METRO or P&P officers contacted Ms. Pascalau to discuss their observations and verify whether Mr. Williams was in violation of his parole terms. *Id*. at 116.

P&P officers concluded Mr. Williams was in violation of parole by moving from his registered address at Kolson Circle without obtaining his parole officer's permission. *Id*. at 85.

### D.    Officers' surveillance at Spruce Hill

That same day, on March 11, 2021, Officer Mahar and  several other METRO officers established surveillance at Spruce Hill around 3:00 p.m. ECF No. 50 at 63–64, 66, 68, 70. No prior surveillance had been conducted. *Id*. at 128. Officer Mahar learned that the white Cadillac matching the anonymous tip was in the driveway. *Id*. at 70.

While on surveillance, Officer Mahar saw Adrielle Williams (the registered owner of the Cadillac) and a young girl leave, drive off in the Cadillac, and later return to the home. *Id.* at 73, 82. He later observed a young boy exit the home and decided to conduct a records search with the Clark County School District. *Id*. at 74–76, 147. Those records showed Gerald Williams had three children registered at Spruce Hill. *Id*. at 74–76, 147. Officer Mahar could not remember whether those records indicated Mr. Williams lived there as well. *Id*. He also found a January 17, 2021 Facebook post on Darryl Williams'[8] page. *Id*. at 76–78, 150. He believed that was a picture of Gerald Williams and his family in front of the Spruce Hill home, and that the male in the picture was not of Darryll Williams. *Id*. at 76–78, 150.

---

[7] The information also conflicted with the Kolson Circle property manager who told P&P officers on March 11, 2021 that Mr. Williams had moved to Kolson Circle in January of that year. ECF No. 50 at 163.
[8] Darryl Williams is Mr. Williams' twin. ECF No. 50 at 78, 151.

1    Officer Mahar observed Mr. Williams exit the home three times. First, he got on a bike. [9]

2    *Id*. at 80.  Second, he filmed himself in the driveway. *Id*. at 81. And third, he left in the Cadillac.

3    *Id*. at 82. Officers did not observe Mr. Williams use a key to exit or re-enter the home. *Id*. at 134.

4    They did not observe him carrying groceries, laundry, newspapers, or mail into the house.[10] *Id*. at

5    135. And none of them spoke to the neighbors (or checked trash receptacles) to find out whether

6    Mr. Williams may have been living there. *Id*. at 136.

7    When Mr. Williams left in the white Cadillac, officers followed him. *Id*. at 83. They

8    observed him stop at a liquor store and at an apartment building. *Id*. at 90, 93, 139. Officers

9    believed that he was buying or selling drugs at both locations. *Id*. at 91, 94. Once Mr. Williams

10   made an illegal U-turn, METRO pulled him over. The surveillance of Mr. Williams, from the

11   time METRO set up surveillance at Spruce Hill to the time they pulled him over, lasted a total of

12   four hours. *Id*. at 231.

13   **E.    Traffic stop**

14   Officers Garboski and Hunt pulled Mr. Williams over after they watched him make an

15   illegal U-turn. *Id*. at 6, 10. By then, METRO believed Mr. Williams was in violation of his parole

16   conditions by not residing at Kolson Circle and also selling drugs. *Id*. at 85, 90.

17   As soon as Officer Garboski approached the car, Mr. Williams gave him his driver's

18   license, issued in 2017, which listed the Spruce Hill address. *Id*. at 33. Officer Garboski asked

19   Mr. Williams whether he had any weapons in the car before ordering him out of the car. G Ex 5 at

20   1:28, 1:35. Officer Hunt was standing by the passenger side of the car. *Id*. Officer Garboski told

21   Mr. Williams to face the car and place his hands behind his back. *Id*. at 1:40. Although he also

22   told Mr. Williams he was not under arrest, he placed him in handcuffs. *Id*. at 1:48. He patted him

23   down. *Id*. at 2:03. Then, Officer Garboski moved Mr. Williams to the front of the patrol vehicle

24   and asked, once again, if he had any weapons in the car. *Id*. at 2:08. Officer Hunt then asked Mr.

25   Williams if he could search the car. *Id*. at 2:20. While at first Mr. Williams told the officers they

26

27   [9] While it may have been possible that the person observed was Gerald Williams' twin, Officer Mahar ultimately testified that the person observed  was the same person who was ultimately stopped in the car, Gerald Williams. *Id*. at 166–67.

28   [10] Officer Mahar observed the young boy checking the mail. *Id*. at 129.

could only search the trunk, he eventually made clear they could search the entire car. *Id*. at 2:22-2:37. Officer Hunt started searching the car but stopped once Officer Garboski told him to do so. *Id*. at 2:50-3:27.

Mr. Williams remained in front of the police car, handcuffed. *Id*. at 2:08-47:16. During this time, Officer Garboski asked Mr. Williams whether he was staying at Spruce Hill or not. *Id*. at 5:05-5:30. When initially asked, Mr. Williams lied. He said he did not know who lived at Spruce Hill and that he had not been there since 2017. *Id*. Shortly thereafter, Mr. Williams stated his wife lived at that address. *Id*. at 7:52-8:00.

While Mr. Williams was being questioned at the car stop, P&P officers Lindsey, Gaddis, and Reinert (who had been at Kolson investigating whether Mr. Williams was living there) arrived. *Id*. at 8:46. They invoked the parole search clause to search the car after they determined Mr. Williams had control of it. ECF No. 50 at 204; ECF No. 51 at 36–37. They found crack cocaine and $347 inside the car. ECF No. 50 at 204, 206; ECF No. 51 at 38–39.

Following the car search, Officers Gaddis, Garboski, and Lindsey[11] told Mr. Williams they knew he was not living at Kolson Circle and wanted him to reveal where he had been staying during the past three weeks. *See, e.g.,* Gov Ex 5 at 21:02-23:50, 25:53-26:07, 29:47-31:54. Around the 21-minute mark, Officer Garboski made clear to Mr. Williams this was no ordinary stop and that they were aware he was in violation of his parole conditions:

- "Does it sound like by the tone of our voice that we obviously know something else?";
- "We are trying to help you out";
- "You've been stopped how many times—has parole and probation come on to a stop within 15 minutes?";
- "When [Officer Lindsay] is asking you questions, my advice is that you start being a little more honest with him because he's about the only person who can help you out";
- This is obviously different –we obviously know more than you think."

*Id.* at 22:37-23:38.

---

[11] During the duration of this questioning, Officer Lindsey scrolled through Defendant's phone. Gov Ex 5 at 15:22-29:45.

Mr. Williams said he did not know it was a violation not to stay at Kolson Circle. *Id*. at 21:38-21:55. He also shared that he stayed with his uncle (at Tropicana and Spencer), at one of his children's mothers (Morgan Harris who resided at 1832 Verde Morada), and that he slept at Spruce Hill. *Id*. at 22:16, 23:35, 26:10-26:55, 30:29-31:54. Defendant was not *Mirandized* during this encounter. ECF No. 51 at 64–65. Officers did not investigate or visit the addresses that Mr. Williams provided. ECF No. 50 at 216.

Because Mr. Williams lied about when he was last at Spruce Hill, Officer Garboski believed he was trying to separate himself from that address and keeping something illegal there. *Id*. at 42; Gov Ex 5 at 19:59-20:05. Officer Garboski also showed Mr. Williams the drugs found in the Cadillac before placing Mr. Williams in the patrol car. *Id*. at 45:13-45:16.

### F.      Mr. Williams is transported to Spruce Hill.

Shortly after Mr. Williams was pulled over, officers discussed invoking the parole search clause to search Spruce Hill. Gov Ex 5 at 6:09-6:31. As a result, they went to Spruce Hill and brought Mr. Williams with them in the patrol car. *Id*. at 54:11-54:34. Once they arrived, Mr. Williams said, "Why are we at my house?" *Id*. at 1:21:10. Quickly thereafter he clarified that he did not live there but that his family did. *Id*. at 1:21:24. Officer Garboski told Mr. Williams they would invoke the parole search clause to search the house. *Id*. at 1:21:17.

Mr. Williams' wife and kids were inside the house. ECF No. 51 at 45. Mr. Williams' wife was not cooperating with the officers: she was yelling and would not open the door. *Id*. P&P was going to enter the house irrespective of whether Mr. Williams' wife opened the door. *Id*. at 46. Officer Garboski asked Mr. Williams if there were any weapons or guns inside the house that could be used to harm them upon entry. *Id*. at 47. Mr. Williams had still not been provided *Miranda* warnings at the time Officer Garboski asked him that question. *Id*. at 51. Officer Garboski explained this question was asked as a safety precaution. *Id*. at 46-47. Mr. Williams responded and stated there was a firearm in the house. *Id*. at 47.

Officer Garboski told the other officers that Mr. Williams stated a firearm would be found inside the house. *Id*. at 48. Based on that information officers tried to get Mr. William's wife to come out of the house. *Id*. Mr. Williams' wife was not being cooperative and would not open the

door. *Id*. at 45. Officer Lindsey tried to use the keys that were part of the Cadillac's key ring holder to get into Spruce Hill. ECF No. 50 at 100. As he was doing so, Mr. Williams' wife opened the door and allowed them to come inside. *Id*.

Officers went inside and found a gun inside the house. *Id*. at 101. They then froze the area and obtained a telephonic warrant to search the remainder of the house. *Id*. Once officers executed the warrant, they found two other guns, methamphetamine, two digital scales, and plastic baggies. *Id*., ECF No. 33 at 6.

### G.   Post-*Miranda* statements

Following the search of Spruce Hill pursuant to the search warrant, Officer Garboski read Mr. Williams *Miranda* warnings and conducted an audio-recorded interview. ECF No. 51 at 51. He asked Mr. Williams about the items found at Spruce Hill. ECF No. 51 at 51-53. [12]

## IV.   Analysis

### A.  Brief Summary

To provide a clear understanding of the multiple issues raised by Mr. Williams' motion, this Court will provide a brief overview before delving into a more detailed analysis.

At the outset, it is important to note that the arguments at hand overwhelmingly involve the propriety of a search warrant affidavit containing evidence Mr. Williams argues was illegally obtained. In such cases, if there is a determination that evidence has been illegally obtained, courts excise the tainted evidence and ask whether the remaining evidence would still contain probable cause for a search warrant to issue. But this record does not contain the search warrant affidavit needed for this Court to conduct that analysis. As a result, it cannot conclusively determine whether the search warrant affidavit would have still contained sufficient probable cause to search Spruce Hill for evidence of drugs and guns despite certain excisions. Accordingly, this Court will simply determine whether certain evidence was lawfully obtained or not and, as a result, whether it would need to be excised from the search warrant affidavit.

---

[12] This Court is not considering the transcript of Mr. Williams' post-*Miranda* statements as they were not admitted into evidence.

The first question the Court needs to answer is whether Mr. Williams' seizure was lawful. The Court finds there was reasonable suspicion to believe Mr. Williams was no longer residing at Kolson Circle and was, as a result, in violation of his parole conditions. There was no Fourth Amendment violation because Mr. Williams could have been arrested at the time the car was stopped. In the alternative, the Court also finds that—because there was reasonable suspicion to believe he was in violation of parole (by not living at Kolson)—the stop was not unlawfully prolonged. Given this finding, this Court does not need to also determine whether there was reasonable suspicion to believe Mr. Williams was engaged in the sale of drugs.[13]

Having determined that Mr. Williams' seizure comported with the Fourth Amendment, this Court must then answer whether the search of the car was lawful. There are two bases supporting the legality of the car search. First, it was lawful for P&P to invoke the parole search clause to search the car because Mr. Williams' was clearly and unambiguously informed of the search clause and officers had probable cause to believe he was in control of the car. In addition, Mr. Williams consented to the search of the car. As a result, the physical evidence found in the car (drugs and cash) were lawfully obtained and would not need to be excised from the search warrant affidavit.

Next, this Court must determine whether the statement Mr. Williams made in violation of *Miranda* statements can form part of the search warrant affidavit to determine probable cause to search Spruce Hill or whether they need to be excised. This Court finds those statements do not need to be excised from the warrant affidavit as voluntary statements obtained in violation of *Miranda* can be used to support probable cause. [14]

Lastly, as it concerns the contents of the search warrant affidavit, this Court must consider whether evidence obtained as a result of invoking the parole search clause to search Spruce Hill was constitutional. In order to invoke the parole search clause at Spruce Hill officers needed

---

[13] Irrespective of this Court's conclusions as to whether there was reasonable suspicion to believe Mr. Williams was selling drugs while he was being surveilled, those observations (and conclusions) could have been included in the search warrant affidavit. Whether the search warrant affidavit contained sufficient probable cause that contraband would be found at Spruce Hill is a different question, and as explained above, one this Court cannot answer.

[14] Mr. Williams did not argue these statements were involuntary.

1    probable cause to believe Mr. Williams was living there. This Court finds there was no probable

2    cause to believe Mr. Williams was living at Spruce Hill. Thus, the invocation of the search clause

3    to search Spruce Hill was unlawful. The gun must be suppressed and the fact that P&P located a

4    firearm during this search must be stricken from the search warrant affidavit to search Spruce

5    Hill.[15]

6        In short, the search warrant affidavit to search Spruce Hill could not include information

7    about the gun found at Spruce Hill as a result of invoking the parole search clause as there was no

8    probable cause to believe Mr. Williams lived there. But the search warrant affidavit could include

9    the drugs and cash that were found in the car after Mr. Williams was pulled over, and the

10   statements Mr. William made in violation of *Miranda*.

11       Next, this Court must determine whether the Government can use the statement Mr.

12   Williams made in violation of *Miranda* during its case in chief at trial. It cannot. Nevertheless,

13   Mr. Williams' statement that a gun would be found inside the house is admissible pursuant to the

14   public safety exception to *Miranda*.

15       Lastly, this Court must determine whether the post-*Miranda* statements must be

16   suppressed as *Seibert* violations. This Court finds they must be suppressed as there was a

17   deliberate decision not to provide *Miranda* warnings and the mid-stream warning was not

18   effective.

19                          **B.  The search warrant affidavit**

20                    **1.  Mr. Williams' seizure was not unlawfully prolonged.**

21       This Court starts its analysis with Mr. Williams' seizure. There is no question that Mr.

22   Williams was properly stopped based on the illegal U-turn. The question is whether his

23   warrantless seizure was unlawfully prolonged. It is the Government's burden to establish that "a

24   warrantless search or seizure falls within an exception to the warrant requirement." *United States*

25   *v. Scott*, 705 F.3d 410, 416–17 (9th Cir. 2012) (citation omitted).

26

27       [15] The Government did not make any arguments regarding inevitable discovery. And in any event, this Court
     cannot determine whether the inevitable discovery doctrine would come into play without first determining whether

28   the search warrant was properly executed pursuant to a finding of probable cause to believe contraband would be
     found at Spruce Hill.

This Court finds the Government has met its burden and established Mr. Williams' seizure was not unlawfully prolonged as officers could have arrested him based on the information they had regarding his violation of parole. Alternatively, there was reasonable suspicion that Mr. Williams was in violation of his parole, allowing for the prolongation of the stop.

"[P]robable cause is not required to arrest a parolee for a violation of parole. Warrantless arrests of parole violators are also valid." *United States v. Butcher*, 926 F.2d 811, 814 (9th Cir. 1991) (citations omitted). If an officer reasonably believes that a parolee is in violation of his parole, the officer may arrest the parolee. *United States v. Rabb*, 752 F.2d 1320, 1324 (9th Cir. 1984) (abrogated in part on other grounds by *Bourjaily v. United States*, 483 U.S. 171 (1987)).

Reasonable-suspicion determinations require that courts look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "Reasonable suspicion must be based on more than an officer's 'inchoate and unparticularized suspicion or hunch.'" *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (citations omitted) (emphasis in original). "[E]ven when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir.2007). Although courts must take into account factors weighing both in favor and against reasonable suspicion, innocent explanations do not necessarily tip the balance. *United States v. Tiong*, 224 F.3d 1136, 1140.

Here, it was reasonable for officers to believe Mr. Williams was in violation of his parole condition by no longer residing at Kolson Circle. By the time of the stop, P&P officers had visited the Kolson residence to see if he was still living there. ECF No. 50 at 192. Once at Kolson Circle, officers learned that one of Mr. Williams' roommates had not seen Mr. Williams in about three weeks. *Id*. at 220. More importantly, there were hardly any material items on Mr. Williams' side

1  of the room. *Id*. at 194. In fact, there was only a pair of undergarments and shorts on Mr.

2  Williams' bed. *Id*. All of this information had been conveyed to the officers effectuating the stop.

3  ECF No. 49 at 153-54. The lack of any meaningful material items on Mr. Williams' side of the

4  room coupled with the roommate's statement provided a particularized and objective basis for

5  believing Mr. Williams did not live there.

6          This Court has taken into account that the roommate and Mr. Williams may have had

7  opposite work schedules, that the roommate may have lied about not having seen Mr. Williams,

8  and that officers could have done a more thorough inspection of the place to see if Mr. Williams

9  was living there (like looking in the kitchen or contacting Ms. Pascalau). And it is true that

10 Officer Lindsey was mistaken when he told Officer Mahar that Ms. Pascalau had not seen Mr.

11 Williams at Kolson since October of 2020. But none of those facts diminish the weighty impact

12 that the lack of belongings on Mr. Williams' side of the room has on the reasonable suspicion

13 analysis. Even acknowledging that those who reside at places like Kolson Circle may choose not

14 to keep many belongings there, the amount of belongings Mr. Williams' roommate had on his

15 side of the room served as a good comparator for purposes of forming reasonable suspicion. That,

16 coupled with the roommate's statement that he had not seen Mr. Williams for the last three weeks

17 comprised a reasonable belief that Mr. Williams was not living there and in violation of his

18 parole. As such, officers could have arrested Mr. Williams as soon as he was pulled over for the

19 traffic violation. Thus, there is no need to apply *Rodriguez* as prolongation is no longer an issue—

20 there were ground for his arrest form the inception of the stop.

21          Nevertheless, even if this Court were to analyze these facts under the *Rodriguez*

22 framework, it would find the stop was not unlawfully prolonged as there was reasonable

23 suspicion to believe Mr. Williams was in violation of his parole conditions by no longer residing

24 at Kolson. *Rodriguez,* 575 U.S. at 357 (finding that stop can be lawfully prolonged if there is

25 reasonable suspicion of criminal activity).[16]

26          _____

27          [16] Mr. Williams made a Fourth Amendment argument asking this Court not to rely on the License Plate
   Reader hits to determine whether there was reasonable suspicion to believe he was not living at Kolson Circle or that
   he was living at Spruce Hill. ECF No. 56 at 15. Assuming without deciding that Mr. Williams has standing to raise
28 this issue, this Court finds the LPR hits to be of no assistance to the legal determinations in this case. Even the
   Government conceded the minimum probative value of this information. Oct. 12 Hearing at 25:38-27:42:. That is, the

**2. The search of the car was lawful.**

Having determined there was no Fourth Amendment violation with regards to the duration of Mr. Williams' seizure, the next question is whether the search of the car was lawful. This Court finds the search of the car was lawful on two different grounds. First, invoking the parole search clause to search the car comported with the Fourth Amendment because the search clause had been clearly and unambiguously expressed to Mr. Williams and there was probable cause to believe he was in control of the car. Second, Mr. Williams consented to the search of the car.

**3. P&P officers properly invoked the parole search clause.**

**i. The search clause was clearly and unambiguously expressed to Mr. Williams and there was probable cause to believe Mr. Williams was in control of the car searched.**

In *Samson v. California*, the United States Supreme Court employed a "totality of the circumstances" test to determine whether a suspicionless search of a parolee could be deemed reasonable under the Fourth Amendment. 547 U.S. at 852. Critically, the Court emphasized that a salient factor in the analysis was whether the parolee had been clearly and unambiguously informed of the search condition in question. The Court concluded that the suspicionless search a parolee, when conducted in accordance with the clear and unambiguous terms of a lawfully imposed and clearly expressed search condition, was reasonable. *Id.* at 852.

Here, the record does not include a signed parole agreement by Mr. Williams. But this Court does not need his signed parole agreement to determine that the search clause was clearly and unambiguously expressed to him as there is other evidence in the record demonstrating they were.

First, the Chronos entry explicitly states that Mr. Williams signed the parole agreement. ECF No. 49 at 21; Gov Ex 2 at 577. Moreover, Officer Pascalau confirmed during the hearing

---

LPR hits indicate each time that the Cadillac was in the area of Kolson Circle or Spruce Hill—but not who was driving it. Thus, this information adds relatively little value to the determination of whether (1) there was reasonable suspicion that Mr. Williams was not living at Kolson Circle or (2) that there was no probable cause to believe Mr. Williams was living at Spruce Hill. This Court did not consider the LPR hits when determining there was reasonable suspicion to believe Mr. Williams was not living at Kolson Circle. Lastly, because the car was registered to Arielle Williams, who lived at Spruce Hill, an LPR hit of the car in that area is not helpful to determining whether there was probable cause to believe that Mr. Williams lived at Spruce Hill to invoke the parole search clause.

that if a parolee refused to sign the parole agreement, she would make a notation to that effect in Chronos and bring the individual before the Parole Board. ECF No. 49 at 20, 36. However, no such notation exists in Mr. Williams' Chronos, and he was not brought before the Parole Board. *Id*. at 37. As explained by Ms. Pascalau, a person cannot be on parole without agreeing to the parole terms. ECF No. 50 at 247. This is consistent with common sense as "the essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972).

During the hearing, Officer Pascalau and Officer Reinert both testified that a suspicionless search is a standard condition of any parole agreement in Nevada. ECF No. 50 at 20, 182-183. Officer Pascalau went over the parole agreement with every one of the parolees she supervised, which included Mr. Williams. *Id*. at 10.[17] Thus, Ms. Pascalau informed Mr. Williams he was subject to the standard parole search clause.

Lastly, there is other evidence that Mr. Williams was aware of other parole conditions— making it unlikely that he would be aware of some conditions but not others. For example, he was submitting monthly reports and was attending treatment, which were conditions of his parole. *Id*. at 27, 35, Gov Ex 2 at 576-77. In addition, Mr. Williams was supposed to be living at Kolson Circle as part of the MAT program, which was a condition of his parole. ECF No. 50 at 15. It would make little sense for Mr. Williams to submit monthly reports, attend treatment, and claim to live at Kolson Circle unless he was attempting to comply with known conditions of his parole. And, Mr. Williams himself can be heard throughout the stop acknowledging Ms. Pascalau was his parole officer (Gov Ex 5 at 5:05, 9:05), that his parole conditions required that he get in touch with her if he was stopped by the police (*id*. at 7:18), and that he had a MAT meeting in the morning which was part of his parole (*id*. at 36:51-37).

---

[17] Although Ms. Pascalau testified she remembers the act of Mr. Williams signing the agreement, the Court puts no weight in that portion of her testimony. This is due to the fact that approximately two years elapsed between what would have been the signing of the agreement and Ms. Pascalau's testimony in court. In addition, at the time the agreement would have been signed, she was supervising between 40 and 60 individuals. Ms. Pascalau could not remember any details surrounding this event that would substantiate a clear recollection of Mr. Williams signing the agreement. Instead, this Court relies on the fact that she met with Mr. Williams, Chronos entries, and other evidence in the record.

1    Thus, this Court finds the search clause was clearly and unambiguously conveyed to Mr.

2    Williams.

3    Before conducting a warrantless search pursuant to a parole search clause, "law

4    enforcement must have probable cause to believe that the supervisee owns or controls the vehicle

5    to be searched." *United States v. Dixon*, 984 F.3d 814, 822 (9th Cir. 2020). The Government

6    bears the burden of justifying a warrantless search. *United States v. Johnson*, 936 F.2d 1082, 1084

7    (9th Cir. 1991).

8    Here, officers observed Mr. Williams driving the car that was ultimately searched. ECF

9    No. 50 at 82. He was the sole occupant, had the keys to the car, and stated that the tools in the

10   trunk were his. *Id*. at 204; ECF No. 51 at 36–37. Thus, the Government met its burden by

11   demonstrating there was probable cause to believe Mr. Williams controlled the car searched and

12   could search the car pursuant to the parole search clause.

13                    **ii.      Mr. Williams consented to the search of the car**

14   There is an alternative ground for the legality of the car search—Mr. Williams' consent.

15   "Warrantless searches are presumptively unreasonable under the Fourth Amendment, subject to

16   certain exceptions." *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38 (9th Cir. 2022)

17   (citation omitted). Consent is one such "specifically established" exception. *Schneckloth v.*

18   *Bustamonte*, 412 U.S. 218, 219 (1973). Police may search a car when they are given "voluntary,"

19   "unequivocal[,] and specific" consent. *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir.

20   2011). "The government bears the burden of proving by a preponderance of the evidence that

21   consent was freely and voluntarily given." *United States v. Wei Seng Phua*, 100 F. Supp. 3d 1040,

22   1043–48 (D. Nev. 2015) (citations omitted).

23   It is undisputed that Mr. Williams gave consent to search the car. While he first

24   equivocated as to whether the scope of the consent extended to the entire car, he eventually made

25   clear officers could search the entire car. Gov Ex 5 at 2:22-2:37.[18] As a result, there would have

26   been no need to excise these facts from the search warrant affidavit used to determine whether

27   there was probable cause to search Spruce Hill.

28   _____
     [18] Mr. Williams did not argue the consent was involuntary.

1

2

3

4

### 4.    Statements

As discussed below, Mr. Williams was subjected to custodial interrogation without having been administered *Miranda* warnings. At this stage, this Court only analyzes whether those statements need to be stricken from the search warrant affidavit relied upon to search Spruce Hill.

*Miranda* violations do not abridge the Fifth Amendment constitutional privilege against self-incrimination, but instead involve prophylactic standards laid down to safeguard that privilege. *See Michigan v. Tucker*, 417 U.S. 433, 446 (1974). Thus, the "fruits of the poisonous tree" doctrine does not control where there is no constitutional violation. *Id.* at 308. The law in the Ninth Circuit is that un-Mirandized but otherwise voluntary statements may be used to establish probable cause. *United States v. Patterson*, 812 F.2d 1188 (9th Cir. 1987) (finding that an affidavit for a search warrant could include statements taken in violation of *Miranda* to establish probable cause); *see also United States v. Guillen*, 657 F. App'x 690 (9th Cir. 2016) (finding that statements may be used to determine whether probable cause existed even if defendant should first have been administered *Miranda* warnings); *United States v. Martinez*, 811 F. App'x 396 (9th Cir. 2020) (finding un-Mirandized but otherwise voluntary statements may be used in a warrant affidavit to establish probable cause).

This Court is bound by *Patterson*. As will be explained below, Mr. Williams was subjected to custodial interrogation without being *Mirandized*. But *Patterson* clearly states that voluntary statements made in violation of *Miranda* can be used to make probable cause determinations. Mr. Williams did not argue his statements were involuntary. As a result, officers could include those statements in the search warrant affidavit to determine whether there was probable cause to believe contraband would be found at Spruce Hill.

### 5.    P&P could not invoke the parole search clause to search Spruce Hill as there was no probable to believe Mr. Williams lived there.

Parole officers may lawfully conduct a warrantless search of a parolee's residence if the parolee is subject to a condition authorizing warrantless searches and officers have probable cause to believe he lives at the residence. *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir.

2013). It is the Government's burden to establish that "a warrantless search or seizure falls within an exception to the warrant requirement." *Scott*, 705 F.3d at 416–17 (citation omitted).

"[P]robable cause as to a residence exists if an officer of 'reasonable caution' would believe, 'based on the totality of [the] circumstances,' that the parolee lives at a particular residence. *Id.* at 975 (citations omitted). This is a "'relatively stringent' standard, which requires more than 'a mere well-founded suspicion.'" *Id.* at 976 (citations omitted). It requires "'strong evidence' that the parolee resides at the address." *Id.* This means that officers must conduct more than a "peripheral" or "cursory" surveillance of the reported address and that they "distinguish between evidence that a parolee had 'visited' a particular residence and evidence that a parolee '*lived* there.'" *Id.* at 977 (citation omitted) (emphasis in original). Importantly, the Ninth Circuit has found that a parolee who is an overnight guest is not co-extensive with living at the residence. *See, e.g., Watts v. County of Sacramento,* 256 F.3d 886, 890 (9th Cir. 2001) (holding that the police lacked a "reasonable belief" that a person who "answered the door of his girlfriend's home in his boxer shorts" sometime after 9:30 p.m. lived in the searched residence); *see also United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) ("It is insufficient to show that the parolee may have spent the night there occasionally."). This more demanding standard is informed by the courts' interest in not "eviscerat[ing] the privacy interests of non-parolees in the home, where Fourth Amendment rights are 'sacrosanct.'" *Grandberry*, 730 F.3d at 982 (citation omitted).

"Certain patterns" emerge in "most cases in which officers have probable cause to conclude that a parolee lived in a residence not reported by [the] parolee as his address." *Id.* at 976 (internal quotation marks and citation omitted). These patterns include the following: "(1) the parolee did not appear to be residing at any address other than the one searched; (2) the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base; (3) the parolee had a key to the residence in question; and (4) either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee." *Id.* (internal quotation marks and citation omitted).

The investigation prior to and during the surveillance did not reveal anything that would have given officers "good reason to suspect that [Mr. Williams] was using his unreported

residence as his home base" or that Mr. Williams "did not appear to be residing at any address other than the one searched." *Grandberry*, 730 F.3d at 982. Officers saw Defendant exit Spruce Hill three times and enter it twice. ECF No. 49 at 81-83, 134, 231-32. But they did not see how he entered the house—whether someone had to open the door for him or whether he had to use keys to do so. *Id*. at 130-31, 135-36, 231-32. During these observations, Mr. Williams did not do anything of a domestic nature that would indicate he lived there (e.g., pick up mail, bring in groceries). *Id*. at 136. None of the officers asked any neighbors whether Mr. Williams lived at Spruce or examined the trash receptacles for whether they contained anything belonging to Williams. *Id*. at 137. Instead, that surveillance simply revealed he was there for a couple of hours of March 11, 2022. *See Grandberry*, 730 F.3d at 979-80 (finding no probable cause to believe parolee resided at the address despite officers observing him at the residence over nearly two weeks, where he entered and exited the residence on at least six occasions and, at times, used a key to do so); *see also United States v. Thomas*, No. 1:16-CR-0162-BLW, 2017 WL 1591831, at *6 (D. Idaho May 1, 2017) ("The Ninth Circuit in *Grandberry* stressed that a line of cases 'distinguish between evidence that a parolee had visited a particular residence and evidence that he lived there.'") (citation omitted).

The records tying him to Spruce Hill were stale and simply confirmed what officer already knew—that Mr. Williams had lived there before serving time in prison. His driver's license showed the Spruce Hill address, but it had been issued in 2017 (four years earlier). *Id*. at 215. The PSI also showed that address, but it was prepared in 2018 (three years earlier). *Id*. The Clark County School records simply revealed his children registered that address with the school. *Id*. at 147–48. Lastly, a Facebook picture of Mr. Williams and his family in front of Spruce Hill may further corroborate Mr. Williams' presence at Spruce Hill, but it does little to support the notion that he lived there.[19] Lastly, Mr. Williams stated he was staying at several places: Spruce Hill, his uncle's, and with the mother of one of his children.

As explained above, the statements made by Mr. Williams—even if in violation of *Miranda*—can be used by officers to form probable cause that Mr. Williams lived at Spruce Hill.

---

[19] For purposes of this analysis this Court assumed it was Mr. Williams (and not his twin) in that picture.

1    Relevant to this inquiry are the following statements made by Mr. Williams during the traffic

2    stop:

3    •    He lied about when he had last visited Spruce Hill. He initially said that he was

4    last there in 2017 (Gov Ex 5 at 5:35, 8:30), later said he had been there a couple of days ago (*id*.

5    at 1:21:36), and METRO had seen him there earlier that day.

6    •    He was not forthcoming regarding his living situation at Kolson Circle. First, he

7    categorically stated he lived at Kolson (*id*. at 4:38-4:48, 9:20) before ultimately conceding that he

8    had been with his uncle, Ms. Harris, and Spruce Hill (*id*. at 22:00-24:41).

9    •    He stated "Why are we at my house and shit?" after officers transported him to the

10   Spruce Hill address (*id*. at 1:21:10).

11   Although Mr. Williams asked officers why they were at "[his] house," officers knew he

12   had previously lived at Spruce Hill (prior to being on parole) and that his wife and children

13   resided there. They were also aware he clearly spent time at that house as evidenced by the

14   surveillance conducted that day. Thus, the reference to Spruce Hill as "[his] house" when placed

15   in context does not carry the weight the Government attributes to it. *Grandberry*, 730 F.3d at 979-

16   80. Especially since Mr. Williams immediately clarified (consistent with his previous statements)

17   that he did not live there, that Spruce Hill was his family's house, and that he had been stating at

18   other places as well. Gov Ex 5 at 22:00-24:41. Mr. Williams' lies about when he was last at

19   Spruce Hill certainly established he was trying to distance himself from the residence. As it

20   turned out, there were good reasons for him to do so. But distancing himself from Spruce Hills is

21   not indicative of him *living* at Spruce Hill. Lastly, his statements that he did not live at Kolson do

22   not inform officers as to *where* Mr. Williams lived, and by no means did that indicate he lived at

23   Spruce Hill.

24   The last factor to be considered is whether Mr. Williams had keys to the house. The

25   Cadillac's key ring contained keys to the house. But the car was not his—it was his wife's. Thus,

26   the only reason he had keys to the house is because the key ring of the car he was using contained

27   that key.

28

Based on the above, this Court finds the Government did not meet its burden to show the kind of "strong evidence" needed to establish probable cause that Mr. Williams lived at Spruce Hill. The totality of the circumstances showed that (1) Mr. Williams had been observed for a few hours at the house he used to live at before he was sent to prison and to which he referred as "[his] house", (2) he may have been an overnight guest there at times, (3) he was not staying at Kolson Circle, and (4) he was distancing himself from that residence. But this comes nowhere near the kind of demanding standard required by the Ninth Circuit. As a result, the gun found as a result of this search must be suppressed and must be excised from the search warrant affidavit used to determine probable cause to search Spruce Hill.

### C.  Mr. Williams' statements in violation of *Miranda* cannot be used at trial.

As discussed above, officers could use Mr. Williams' statements in violation of *Miranda* can be used to determine whether there was probable cause to believe he lived at Spruce Hill in order to invoke the parole search clause. Officers could also include these statements in the search warrant affidavit to determine if there was probable cause to believe that contraband would be found at Spruce Hill. But the Government cannot introduce statements made in violation of *Miranda* in its case in chief. *Doody v. Ryan*, 649 F.3d 986, 1002 (9th Cir. 2011).

The "touchstone" for *Miranda* warnings is whether the suspect was in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883–84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981)). In addition, "[t]he term 'interrogation' means 'any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Nevertheless, under the public safety exception, *Miranda* warnings need not be given when "police officers ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). In order for the public safety exception to apply, there must have been "an objectively reasonable need to protect the police or the public from immediate danger." *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir.1994). That is, the police must reasonably believe that there is a serious likelihood of harm to the public or fellow officers. *Id*. The officer's subjective motivation in posing the questions is not determinative of whether the interrogation falls within the public safety exception. *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir. 2000). The important question is whether there is an objectively reasonable need to protect the safety of the public or the police. Even if there is such a need, however, the questioning should not be "investigatory in nature" and should be "sufficiently limited in scope to allow the officers to quell the volatile situation they face[ ]." *Id*. at 992.

Mr. Williams was in custody as of the time that P&P officers showed up at the scene. Immediately after being stopped, Officer Garboski ordered Mr. Williams out of his car and told him to face the car and place his hands behind his back. Gov Ex 5 at 1:35-1:40. Although he was told he was not under arrest, he was placed in (double) handcuffs. *Id*. at 1:48. He was patted down. *Id*. at 2:03. He was then moved to the front of the police vehicle and asked if officers could search the car. *Id*. at 2:08-2:20. Officer Hunt started searching the car and stopped once Officer Garboski told him to do so. *Id*. at 2:50-3:27. Mr. Williams remained handcuffed in front of the police car for a few minutes until three officers from P&P arrived. *Id*. at 2:08-8:46. Although he was told he was being stopped for a U-turn, there were five law enforcement officers (including P&P officers) surrounding him and searching his car and his phone. In these circumstances, a reasonable innocent person would not have concluded he would be free to leave after brief questioning.

While in custody, Mr. Williams was subjected to interrogation. He was repeatedly confronted about his living arrangements and whether he was staying at Kolson or not. *See, e.g., id*. at 21:02-23:50, 25:53-26:07, 29:47-31:54. METRO and P&P officers were aware of Mr. Williams' parole conditions. *See, e.g.,* ECF No. 49 at 64-65. As a result, they should have known

that questions about where he had been staying at (and telling him they knew he was not staying at Kolson Circle) would likely elicit incriminating responses. And Officer Garboski admitted he knew the answers to those questions could be used against Mr. Williams in his parole proceeding. ECF No. 51 at 64. Thus, Mr. Williams was subjected to interrogation as the officers' questions were reasonably likely to elicit an incriminating response. [20]

Given the Government's argument, it appears there is no interest in introducing statements about Mr. Williams' parole violation at trial. Instead, the only issue appears to be whether the Government can introduce Mr. Williams' statement that a gun would be found inside the house under the public safety exception to *Miranda*.

This Court finds that the public safety exception to *Miranda* applies, and that Mr. Williams' statement is admissible at trial. The Government has demonstrated that Officer Garboski's question was reasonably prompted by a concern for the public safety. At the point Officer Garboski asked the question, he knew Mr. Williams' wife and children were in the house and that Mr. Williams' wife was not cooperating with officers. ECF No. 51 at 45. P&P Officers were going to enter Spruce Hill irrespective of whether Mr. Williams' wife opened the door or not. *Id*. at 46. So, Officer Garboski asked Mr. Williams if there were any weapons or guns inside the house that could be used to harm them upon entry. *Id*. at 47. Mr. Williams stated there was a firearm in the house. *Id*. The record does not reflect that Officer Garboski asked any other questions at that point. *See id*. From an objective standpoint, Officer Garboski's question was motivated by a need to neutralize a potentially volatile situation, rather than an opportunity to collect evidence for later prosecution. Thus, Mr. Williams' statement that a firearm would be found in the house is admissible.

### D.   *Seibert*

The Court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights. *United States v. Williams*,

---

[20] The Government does not argue that Mr. Williams was (1) not in custody or (2) not subject to interrogation.

435 F.3d 1148, 1157 (9th Cir. 2006). A deliberate two-step interrogation occurs when an officer deliberately questions the suspect without *Miranda* warnings, obtains a confession or inculpatory admission, offers mid-stream warnings after the suspect has admitted involvement or guilt, and then has the suspect repeat his confession or elaborate on his earlier statements. *Id*. at 1159–60. If law enforcement "deliberately employed the two-step strategy," courts then "evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible." *Id*. at 1160 (citing *Seibert*, 542 U.S. at 615).

In order to determine whether the interrogator deliberately withheld *Miranda* warnings, courts consider "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Id*. at 1159. The Ninth Circuit explained that delay in providing *Miranda* warnings to a suspect who is being subjected to custodial interrogation suggests "the interrogator's desire to weaken the warning's effectiveness." *Id*. at 1159. In addition, "the officer's deferral of the warning until after a suspect's incriminating response further supports an inference of deliberateness." *Id*. at 1160.

When an interrogator has deliberately employed the two-step strategy, *Seibert* requires courts to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the post warning statement is admissible. *Id*. The court must determine whether the midstream warning adequately and effectively apprised the suspect that he had a "'genuine choice whether to follow up on [his] earlier admission.'" *Id*. at 1160 (quoting *Seibert*, 542 U.S. at 616) (brackets in original). The Ninth Circuit has adopted six factors to make this determination. *Id*. Three of these factors are also considered in the analysis of deliberateness: the overlapping content of the two rounds of interrogation, the completeness and detail of the prewarning interrogation, and the continuity of police personnel. *Id*. In addition, the Court should consider the timing and circumstances of both interrogations, the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first, and whether any curative measures were taken. *Id*.

1        The Government bears the burden of proving by a preponderance of the evidence that the

2 interrogating officer did not deliberately withhold the requisite warnings as part of a calculated

3 strategy to foil *Miranda*. *United States v. Guillen*, 995 F.3d 1095, 1121 (10th Cir. 2021); *see also*

4 *United States v. Magallon*, 984 F.3d 1263 (8th Cir. 2021); *United States v. Stewart*, 536 F.3d 714,

5 719 (7th Cir. 2008)).

6        As discussed above, Mr. Williams was subject to custodial interrogation once P&P

7 showed up at the scene of the traffic stop. This Court finds that officers deliberately withheld

8 *Miranda* warnings from Mr. Williams.

9        During the traffic stop, officers questioned Mr. Williams for approximately 20 minutes

10 about not living at Kolson Circle. Gov Ex 5 at 19:00-36:00. P&P Officer Lindsay conducted most

11 of the interrogation, but Officer Garboski was present during most of the interrogation and

12 participated in it as well. *See* Gov Ex 5. In fact, the reason this Court knows of Officer Garboski's

13 presence and participation is because the interrogation was captured by his body camera. *Id*. As to

14 the second interrogation, it was Officer Garboski who questioned Mr. Williams. ECF No. 51 at

15 51. Thus, there was continuity of police personnel between the first and second interrogation.

16 *Williams*, 435 F.3d at 1160.

17        There was also overlapping content between both interrogations. The Government argues

18 Mr. Williams was not asked about the instant charges during the first round of interrogation. But

19 that is not entirely correct—Officer Garboski did ask Mr. Williams if any weapons would be

20 found at Spruce Hill. ECF No. 51 at 47. As this Court already found, Officer Garboski was

21 permitted to do so under the public safety exception. But that does not change the fact that Mr.

22 Williams admitted to the presence of one of the guns that is the subject of the Superseding

23 Indictment during the first round of interrogation.[21] Officer Garboski asked questions regarding

24 this topic during the second interrogation as well. ECF No. 51 at 52.

25

26

27       [21] The fact that the Government can use this statement at trial pursuant to the public safety
exception is a completely separate issue from whether the admission can be considered to determine if
28 there was a *Seibert* violation.

As to the detail and completeness of the first interrogation, by the time it concluded Mr. Williams had admitted to violating his parole: "I didn't know it was a violation (Gov Ex 5 at 21:39); "I didn't know I had to stay [at Kolson]" (*id*. at 21:46-21:56); stated he had been staying with his uncle (*id*. at 22:16), with the mother of one of his children (*id*. at 26:10-26:55), and at Spruce Hill (*id*. at 31:46-31:50). He also admitted he had a firearm inside Spruce Hill. ECF No. 51 at 47. The Government is correct in pointing out that the first interrogation did not include questions about drug dealing (although Officer Garboski showed Mr. Williams the drugs found inside the car while at the traffic stop, which invited a response). Gov. Ex 5 at 45:15-45:30. In this regard, this case is not like others where all of the topics discussed during the first interrogation were discussed during the second interrogation as well. Nevertheless, one of the topics (guns) was discussed during both interrogations.

Importantly, Officer Garboski admitted he knew that the un*Mirandized* answers Mr. Williams provided during the first interrogation were incriminating and could be used against him to revoke his parole. ECF No. 51 at 64. He also should have known that showing him the drugs would likely result in an incriminating response. It was also Officer Garboski who implied to Mr. Williams he was in trouble, that officers knew about it, and that they were trying to help him out. *Id*. at 22:15-23:37. Tellingly, during the traffic stop, when Mr. Williams did not give him the response he wanted regarding the parole violation, Officer Garboski said, "Okay, I tried." *Id*. at 23:45-23:49. In short, neither he nor anyone else administered *Miranda* warnings knowing they were asking questions likely to elicit incriminating responses. This Court finds the Government has not met its burden to show officers did not deliberately withhold *Miranda* warnings. *Williams*, 435 F.3d at 1160 ("Because law enforcement officers generally retain control over the timing of a *Miranda* warning and giving the warning to a custodial suspect imposes only a minimal burden, the officer's deferral of the warning until after a suspect's incriminating response further supports an inference of deliberateness.")

In addition, the midstream *Miranda* warning was not effective. First, it was Officer Garboski who read *Miranda* warnings to Mr. Williams—the same officer who had obtained the previous admissions regarding the parole violation and the firearm at Spruce Hill. This was the

same officer who previously made clear to Mr. Williams they had a lot of information about him and that it behooved him to be honest. *See, e.g.,* Gov Ex 5 at 22:06-23:38; 29:56-31:17.

The traffic stop started at 7:10 pm. *Id*. at 65. The stop took 55 minutes. *Id*. at 00:00-55:00. It took approximately 25 minutes to transport Mr. Williams to Spruce Hill. *Id*. at 55:00-1:19. It is not clear how much time elapsed once they arrived at Spruce Hill before Officer Garboski asked Mr. Williams whether any firearms would be found at Spruce Hill. There was also a gap between this question and the post-*Miranda* confession. But Mr. Williams was with Officer Garboski during the traffic stop, during the transportation to Spruce Hill, and during the post-*Miranda* confession. Most importantly, the record does not reflect that Officer Garboski took any curative measures—he did not advise Mr. Williams that his prior unwarned statements could not be used, making it "reasonable to regard the two sessions as parts of a continuum[.]" *See Seibert*, 542 U.S. at 616–17.

In short, Mr. Williams had been in custody for approximately three hours before Officer Garboski administered him *Miranda* warnings. By the time Mr. Williams was *Mirandized*, he had already admitted to violating parole and to possessing a firearm. The officer who read him *Miranda* was the same officer who had obtained the previous admissions, who showed him the drugs that were found in the Cadillac, and who told him it behooved him to be helpful. In this context, the midstream warning was inadequate at apprising Mr. Williams that he had a "genuine choice whether to follow up on [his] earlier admission." *Williams*, 435 F.3d at 1160 (quoting *Seibert*, 542 U.S. at 616).

//
//
//
//
//
//
//
//

1

**V.      Conclusion**

2          This Court recommends that the firearm found inside Spruce Hill as a result of invoking

3   the parole search clause be suppressed and that the Government not be allowed to introduce the

4   post-*Miranda* statements at trial.

5          **IT IS THEREFORE RECOMMENDED** that Mr. Williams' Motion to Suppress (ECF

6   No. 28) be GRANTED in part and DENIED in part consistent with this opinion.

7

8          DATED: March 31, 2023.

9                                                                         _____

10                                                                        BRENDA WEKSLER
                                                                          UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28